## UNITED STATES v. DONNELLY.
### No. 9761.

United States Court of Appeals
Seventh Circuit.
Jan. 12, 1950.

George F. Callaghan, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Attorney, Richard E. Gorman, Asst. U. S. Dist. Atty., Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

DUFFY, Circuit Judge.

Defendant was convicted by a jury of the charge of armed robbery of the Valentine Federal Savings and Loan Association of Cicero, Illinois, a banking institution organized under the laws of the United States. On this appeal errors relied upon arise from denial of defendant's motion for judgment of acquittal, rulings of the trial court on the admission and rejection of evidence including the question of an alleged unlawful search and seizure, and instructions to the jury.

It is without dispute that the Valentine Federal Savings and Loan Association (hereinafter referred to as the "bank") was robbed on November 7, 1945, by men who used firearms; and that Edward Meehan, James Evans and John Hendrixson, the latter being the principal government witness herein, participated in that robbery. The ultimate issue in this case is whether or not the defendant, Donnelly, also participated in the holdup of the bank on November 7, 1945.

On that morning three armed men entered the bank. Two witnesses later identified them as Hendrixson, Evans, and Meehan. On January 25, 1946, Hendrixson was arrested. He made a statement to the agents of the F.B.I. and to the police that he, Evans and Meehan had committed the robbery of November 7, 1945, and that a black Pontiac which had been stolen by Evans was used in that robbery. He gave the details of the robbery and of the getaway, and limited the participants to the three persons mentioned. He also confessed that he, Ray Lucas and Dan Harrington had robbed the same bank in April, 1945. Hendrixson, Harrington and Lucas were indicted for the April, 1945, robbery, pleaded guilty, and each was sentenced to 8 years in prison. Thereafter Hendrixson, Evans and Meehan were indicted for the robbery of November 7, 1945, and in October, 1946, Evans was brought to trial on that charge. Hendrixson testified as a government witness, having been brought to Chicago from the penitentiary for that purpose. While in Chicago for the trial, Hendrixson informed the prosecutor that he had further information for him, and on October 22, 1946, made a second statement. Here, for the first time, Hendrixson stated that there were four participants in the November 7 robbery, and he identified the fourth person as "a fellow by the name of Lee, last name not known, (who) hangs around Quigley's Place at 107 W. Lake (Street), Chicago." Hendrixson also stated that the guns used in the November 7 robbery were brought by Lee, and that Lee's 1937 or 1938 Buick was used in the robbery.

On October 24, 1946 a commissioner's warrant for defendant's arrest was issued at Chicago. Two days later, on the basis of a teletype message from Chicago, defendant was arrested at the farm home, located about 30 miles from St. Louis, Missouri, where he had been living since January, 1946. The arrest was made by seven F.B.I. agents with the assistance of three St. Louis police officers. At the time of the arrest the arresting officers did not

have with them either a warrant for defendant's arrest [1] or a search warrant for the premises. The defendant was called to the front porch of the farm home, where he remained in custody of some of the agents. Other agents entered the house, and searched it for 30 to 45 minutes. Defendant did not consent to the search and did not make any statement other than that he desired to consult counsel. The agents found two guns (Exhibits 1 and 2) under some shirts and articles of clothing in a drawer of a dresser located in the bedroom used by the defendant; they also found a box containing six bullets in a clip in an adjoining clothes closet. Defendant denied ownership or knowledge of the guns or ammunition. Defendant waived a removal hearing and was taken to Chicago where he was indicted November 1, 1946. At defendant's trial Hendrixson testified that four men participated in the November 7 robbery of the bank, that defendant was one of them, that defendant drove the participants to the scene of the robbery in his dark blue automobile, that defendant remained in the car while he (Hendrixson), Evans, and Meehan went into and robbed the bank, and that said automobile, driven by defendant, was used in the getaway. He identified the guns, admitted as Exhibits 1 and 2, as having been furnished by the defendant and used in the robbery. One of these guns, a .45 caliber automatic Army pistol, Hendrixson said he could identify because it was the only one of that type he had ever seen. He also testified that just prior to the robbery he had put stolen license plates on defendant's automobile, using a screw driver with a yellow bakelite handle to do so.

Over objection, Hendrixson testified that he, Meehan and defendant had planned a holdup in the Congress Hotel, that a roll of tape had been purchased to bind the intended victim, and that they went to the hotel but, being unable to locate the victim, the plan was not carried out. On motion this testimony was stricken, but a motion by defendant for a mistrial was denied.

Hendrixson testified that Exhibit 3, a screw driver with a yellow bakelite handle, looked like the screw driver he used in changing the license plates on the car.[2] He also testified he had met the defendant at Quigley's in September, 1945, having been introduced to him by Meehan; also that he, defendant, and Meehan met in the first part of November and discussed robbing the bank and had driven to the bank for that purpose, but because a police squad car was parked near the bank that they had postponed carrying out their plan for one week.

■ Although defendant denied Hendrixson's testimony in every material respect, and although Hendrixson was an accomplice with a long criminal record, and although Meehan, one of the robbers, consistently and stoutly denied that defendant participated in the robbery, nevertheless, upon review, considering the evidence in the light most favorable to the government, we cannot say that the verdict is without the requisite evidentiary support upon a motion for a judgment of acquittal. The district court did not, therefore, err in denying such motion by the defendant.

■ We now consider whether Exhibits 1, 2 and 5, being two guns and ammunition, were obtained by an unlawful search and seizure when they were seized by the federal arresting officers. If so, they may not be used for any purpose. Silverthorne Lumber Co., Inc., et al. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177. In trying to decide whether or not a given

1. Although the officers did not have warrant with them, the arrest was lawful, since under the rules the warrant need not be in officer's possession. Federal Rules of Criminal Procedure, Rule 4(c) (3), 18 U.S.C.A. See: United States v. Petti, 2 Cir., 168 F.2d 221.

2. F.B.I. Agent Staab testified he took Exhibit 3, and also a roll of tape, from the glove compartment of a 1939 Buick owned by one Hurrell, a brother-in-law of defendant, who had purchased the Buick from defendant.

search and seizure was lawful, we must necessarily enter into an area of constitutional law that is now beclouded with uncertainty, and where our path is beset with difficulties. Within the past three years the Supreme Court has handed down many decisions involving search and seizure, by a court usually divided five to four or six to three. The most important and pertinent of these decisions are listed in a footnote.[3]

Prior to Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, the rule was generally accepted that a warrant to take a person into custody was authority for seizing all things found upon his person or in his hands or in such open and immediate physical relation to him as to be in a fair sense a projection of his person. But the majority in the Harris case went further and upheld a five-hour general rummaging search. Defendant was in exclusive possession of a four room apartment, and was arrested in the living room on the charges of violating the postal laws and the National Stolen Property Act, while the draft cards, which were the subject of his subsequent prosecution, were found in a bedroom. If Harris v. United States, supra, were the last word from the Supreme Court on this issue, we should feel strongly inclined to uphold the validity of the search and seizure in the case at bar (See: United States v. Rabinowitz, 2 Cir., 176 F.2d 732, 734), although recognizing that in the Harris case the court emphasized that the draft documents were government property and that defendant's possession of them was in effect a continuing offense in the presence of the officers. It is significant that in two of the three dissenting opinions in the Harris case, 331 U.S. at pages 172, 190, 67 S.Ct. at pages 1111, 1116, 91 L.Ed. 1399, it was insisted that sufficient opportunity for obtaining a

search warrant existed, and those opinions strongly indicated that such circumstance in itself was enough to make a search without warrant unreasonable.

About 9 months later the Supreme Court in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, held invalid a search of a hotel room and the seizure of opium smoking apparatus immediately following the arrest of the defendant. The majority held that the search was unreasonable because the arresting officers had ample opportunity to obtain a search warrant.

Four months thereafter the Supreme Court decided Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663. There the officers entered, with the owner's consent, the premises upon which a still was located, and arrested the operator of the still without a warrant, and seized distillery apparatus which they could observe through the open door. Despite an offense being committed in the presence of the officers, and the location of the distilling apparatus being in plain view, which previously was sufficient to sustain a seizure incident to an arrest (Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231), the majority held that the seizure was illegal because the agents had sufficient time and information to procure a search warrant. The court said, 334 U.S. at page 708, 68 S.Ct. at page 1234:

"* * * But there must be something more in the way of necessity than merely a lawful arrest. The mere fact that there is a valid arrest does not *ipso facto* legalize a search or seizure without a warrant. * * *"

Then followed McDonald et al. v. United States, 335 U.S. 451, 69 S.Ct. 191, where the defendant was arrested in his rooming house while engaged in activities con-

3. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663; Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787;

United States v. Hoffman, 335 U.S. 77, 68 S.Ct. 1413, 92 L.Ed. 1830; McDonald, et al. v. United States, 335 U.S. 451, 69 S.Ct. 191; Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302; Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359.

cerned with a numbers lottery, and a search without a warrant was made and articles seized. The search was held to be illegal because no emergency made it impracticable to obtain a search warrant. Here the officers saw a crime being committed in their presence and seized the articles that had a natural connection with such crime.

■ We have also examined the decisions of the Supreme Court subsequent to McDonald, et al. v. United States, supra, and conclude that under the rationale of the Supreme Court decisions subsequent to Harris v. United States, supra, our inquiry here must be whether the circumstances immediately prior to defendant's arrest made it impracticable to obtain a search warrant.

■ Donnelly testified he left Chicago at a date which was some two months after the date of the robbery, on advice of his physician that a change in climate might benefit his sinus condition. Fahey had been his guest on several occasions in Chicago. Donnelly lived continuously in the Fahey home for some ten months prior to his arrest. He and Fahey made frequent trips to St. Louis, among other things attending athletic events, and defendant acted as an official in some boxing bouts. We conclude that the circumstances stated indicate that defendant was not hiding out, and that it would not have been impracticable to have obtained a search warrant before the arrest and before conducting the rummaging search for evidence to be used against the defendant. The search and seizure were thus unreasonable and therefore unlawful. It therefore was error for the court to receive Exhibits 1, 2 and 5 into evidence.

■ The trial court would not admit into evidence either of Hendrixson's two statements, but permitted the government to get the contents of the second statement before the jury by overruling objections to a series of questions repeating the words of the statement, thus:

"Question: Did you on October 22, 1946, tell where you had met Lee?

"Answer: I did." (And so on through the statement.)

In United States v. Sherman et al., 2 Cir., 171 F.2d 619, the court held that the admission of a second statement consistent with testimony given on the trial, but inconsistent with an earlier statement, was reversible error. The Court of Appeals for the Third Circuit made a similar ruling in United States v. Toner, 173 F.2d 140. If admission of a second statement is error though corroborated by testimony, it likewise is error to permit its contents to be received by means of questions and answers, and we so hold.

■ Another incident which prevented defendant from having a fair trial was Hendrixson's testimony on direct examination as to why he changed his story. He stated that while he was being held at the County Jail and prior to his second statement dated October 22, 1946, some unknown person "hollered down the gallery I had better watch out for my wife and kids if I bring Lee into it." Defendant was at that time in Missouri, and was in no manner connected with this alleged threat, which apparently no-one else heard. The court received this highly prejudicial evidence over objection, and denied a motion to strike. This, we think, was error.

■ We are of the opinion that the court erred in its instructions to the jury. After correctly instructing as to the weight to be given to the testimony of an accomplice, the court said:

"The law is that you shall consider the testimony of an accomplice.

"You consider it subject to the same rules and subject to the same tests that you determine the credibility—to which you submit the testimony of all other witnesses. The same rules apply as apply to other evidence and to other witnesses. You will regard the testimony of an accomplice, as I said before, with care, due care, considering that he is an accomplice and considering also all the facts and circumstances in the case just as you would consider the testimony of another witness."

By the part of the instruction just quoted, the court placed the testimony of an accomplice with a long criminal record on the same level with testimony of disin-

terested and respectable witnesses. Defendant excepted to this portion of the charge, but was overruled. Where two instructions are given to the jury, one erroneous and prejudicial, and the other correct, since it is impossible to tell which one the jury followed, it constitutes reversible error. Nicola v. United States, 3 Cir., 72 F.2d 780, 787; McFarland v. United States, D.C.Cir., 174 F.2d 538, 539. A conviction ought not rest on an equivocal direction to the jury upon a basic issue. Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 90 L.Ed. 350. In the case at bar the veracity of the accomplice was a most important factor.

 Five highly respectable witnesses, including a member of the Chicago Board of Trade, an investment banker, and an insurance broker, who had known the defendant for twenty to twenty-five years, testified as to his good reputation for truth, veracity and as a law-abiding citizen. The defendant requested the court to instruct the jury that character evidence may in itself be sufficient to create in the minds of the jury a reasonable doubt as to the guilt of the defendant. The court refused to so instruct, saying to the jury,

"That testimony (referring to defendant's reputation) is competent testimony and you may take it into consideration together with all the other facts and circumstances in the case and this testimony may be considered by you in reaching your verdict. * * *"

We think the instruction formally requested by the defendant should have been given. The outcome of the case depended largely upon the jury's appraisal of the credibility of Hendrixson and of the defendant. Under quite similar circumstances in Snitkin v. United States, 265 F. 489, this court held the failure to give the instruction here requested was reversible

error. See also: Miller et al. v. United States, 10 Cir., 120 F.2d 968. In Edgington v. United States, 164 U.S. 361, at page 366, 17 S.Ct. 72, at page 73, 41 L.Ed. 467, the court said:

"Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although, without it, the other evidence would be convincing."

 The question before us is: What effect did the errors hereinbefore described have, or what effect may they reasonably have had, upon the jury's decision? Kotteakos et al. v. United States, 328 U.S. 750, 763, 66 S.Ct. 1239, 90 L.Ed. 1557. This was a close case, depending largely on the credibility given to the testimony of an alleged accomplice. In Berger v. United States, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314, the Supreme Court characterized the case against Berger for conspiracy as "weak," depending as it did upon the testimony of Katz, an accomplice. We feel the errors were not harmless, Rule 52, Federal Rules of Criminal Procedure; Bollenbach v. United States, supra; Bihn v. United States, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485, and conclude that their cumulative effect was to prejudice substantial rights of the defendant, to the end that the judgment of guilty herein cannot be sustained.

Reversed and remanded for a new trial.